IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARCUS JAMES SMITH, | | |
| | Petitioner, | No. CIV S-05-2601 MCE CHS P |
| vs. | | |
| CLAUDE E. FINN, et al., | | |
| | Respondents. | FINDINGS AND RECOMMENDATIONS |
| _____/ | | |

I.  INTRODUCTION

Petitioner Marcus Smith is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Smith challenges the August 15, 2003, decision by the Board of Prison Terms (now Board of Parole Hearings and hereinafter Board) finding him unsuitable for parole.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that this petition for habeas corpus relief be denied.

/////

II.  FACTUAL AND PROCEDURAL BACKGROUND

  A.  Facts

Smith's commitment offense were recounted at the 2003 hearing as follows:

1

> PRESIDING COMMISSIONER LAWIN: It states on March 11th, 1980, at approximately 10:55 p.m., the Ontario Police Department investigated a shooting incident. According to witness, Ron Anderson and other witnesses, Anderson and the victim, Addie Mae Smith -- That's A-D-D-I-E, capital M-A-E Smith, the estranged wife of the prisoner, had been westbound on Holt, H-O-L-T, in his vehicle on the way to work at General Electric, when the prisoner drove alongside of Anderson's car and fired one shot which hit Anderson in the jaw. Anderson pulled to the curb and got out to seek aid. The prisoner made a u-turn, returned, got out of his vehicle and fired four shots at the victim, who had gotten out of Anderson's car. She died within minutes of gunshot wounds to the brain, according to the coroner's report. There were three bullet wounds to her head and one to her shoulder. The suspect was identified as the victim's husband. On March 13th, 1980, police officers were informed by a subject with whom the prisoner had been staying that he was in possession of the prisoner's vehicle; a 1977 Lincoln. The prisoner told the person that he had to leave town in a hurry, that he would be gone about two months, and left the keys with instructions to use and take care of the car. Officers also learned that the prisoner had made arrangements for his father's continuing care in a convalescent hospital, and that the prisoner called Anderson to explain that he did not mean to shoot him and asked if he needed any money. On July 14, 1982, he was apprehended under the name of Robert Marris, M-AR-R-I-S, and subsequently identified by fingerprints as being the prisoner's (sic). He was extradited to California and was booked in the San -- at the San Bernardino County Jail on August 22nd, 1982.

/////

Answer, Exhibit C at 29-30.[1]

On March 24, 1983, Smith pled guilty to one count of second degree murder. Answer, Ex. A at 2. He was sentenced to a term of fifteen years to life. Id. On August, 15, 2003, the Board held Smith's Subsequent Parol Consideration Hearing. Answer, Ex. C at 17. At the conclusion of that hearing the Board found him unsuitable for parole. Id. at 72.

B. Habeas Review

Smith filed a petition for writ of habeas corpus in the San Bernardino County Superior Court on July 19, 2004.[2] Answer, Ex. E at 17. That petition was denied on August 13,

---

[1] Smith disputed the claim that he called Anderson.

[2] Smith first filed an Administrative Appeal, which was later denied on January 11, 2005. Answer, Ex. D at 2.

2

2004, in a two-paragraph opinion that provided no reasoning. Id. at 28. Smith then filed a petition in the California Court of Appeal, Fourth Appellate District on November 10, 2004. Answer, Ex. F at 31. That petition was summarily denied on November 19, 2004. Id. at 30.

Smith next filed a petition for review in the California Supreme Court on December 21, 2004. Answer, Ex. G at 46. That petition was summarily denied on November 6, 2005. Id. at 45. Finally, Smith filed this federal petition on December 22, 2005.

### III. APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

/////

IV.   DISCUSSION OF PETITIONER'S CLAIM

All of the arguments in Smith's petition rely on a claim of the denial of Constitutional due process.[3]

    1)   Description of Claim

Smith argues that the Board's decision violated his right to due process because it was based solely on "unchanging factors" such as the circumstances of the commitment offense. Petition at 4. He argues that by relying on these factors the Board violated his liberty interest in parole. Id.

    2)   Applicable Law

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging due process violations must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't of Corrections v.

---

[3] In his traverse, Smith raises for the first time a claim concerning an error with his plea colloquy. See Traverse at 3. This challenge to his 1983 conviction is time barred under AEDPA and will not be reviewed.

Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws. Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that California's parole scheme provides prisoners sentenced in California to a state prison term that provides for the possibility of parole with "a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12)).  Accordingly, the court must examine whether the deprivation of petitioner's liberty interest in this case violated due process.

It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

"The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the fact-finder. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d

5

1  703, 705 (9th Cir. 1987)); Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).

2  However, "the evidence underlying the [ ] decision must have some indicia of reliability."

3  Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). See also Perveler v.

4  Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992). Determining whether the "some evidence"

5  standard is satisfied does not require examination of the entire record, independent assessment of

6  the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The

7  question is whether there is any reliable evidence in the record that could support the conclusion

8  reached. Id.

         3)    Discussion

In finding Smith unsuitable for parole, the Board relied upon: a) the circumstances of the commitment offense, b) the need for continued participation in self-help therapy, and c) his lack of adequate parole plans.

         a)    Circumstances of The Commitment Offense

With respect to the circumstances of the commitment offense the Board stated:

> The first -- the first and foremost reason would be the commitment offense and the manner in which it was carried out. It clearly showed a lack of regard for the life and suffering of others. And it was in a very cruel fashion that the inmate fired a gun at his wife's companion, striking him in the jaw. He left and went for assistance. The inmate made a u-turn, came back, and fired and hit his wife, striking her four times in the head and neck, shoulder area, causing her death.

/////

Answer, Ex. C at 72.

The circumstances of the commitment offense are one of fifteen factors relating to an inmate's unsuitability or suitability for parole under California law. Cal. Code. Regs., tit. 15, § 2402(c)(1)-(d). When denial is based on these circumstances the California courts have stated that:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be

> predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors beyond the minimum elements of the crime include, inter alia, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

Irons, 505 F.3d at 852-53; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.")

Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering." In re Smith, 114 Cal.App.4th at 367.

The relevant inquiry however "is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor." In re Lawrence, 44 Cal.4th 1181, 1221 (Cal. 2008); In re Dannenberg, 34 Cal. 4th at 1070-71.

Smith shot Anderson in the jaw because Smith saw his estranged wife, Addie Mae Smith ("Addie Mae"), riding in Anderson's car. Anderson and Addie Mae were coworkers. It is unclear if Smith meant to shoot Anderson or Addie Mae with his first shot. It would have been obvious however that Addie Mae was not alone in the moving vehicle because she was the

7

passenger. By firing into the car Smith disregarded the lives of both Anderson and Addie Mae. It is only by chance that Smith did not also kill Anderson.

There is no question however that Smith intended to shoot and kill Addie Mae. After shooting Anderson, Smith turned his car around, got out, and fired four more shots into Addie Mae's head and shoulder, as she stood outside Anderson's vehicle. Smith never sought aid for Anderson or Addie Mae. Instead he fled town and evaded capture for some time.

The circumstances of Smith's commitment offense could properly be described as dispassionate and calculated, and as being carried out in a manner which demonstrated an exceptionally callous disregard for human suffering. The Board's conclusions regarding the circumstances of the commitment offense are therefore supported by evidence. More importantly, the identified facts were probative to the central issue of Smith's then current dangerousness when considered in light of the full record before the Board. That record included Smith's need for continued participation in self-help therapy and his lack of an adequate parole plan.

/////

          b)     <u>Need For Self-Help Therapy</u>

The Board stated that Smith had not "sufficiently participated in beneficial self-help programs." Answer, Ex. C at 73. The Board determined that Smith needed further therapy because he repeatedly explained previous incidents of violence by claiming that the other people involved were lying. <u>Id.</u> At 75. The Board stated:

> And really what we saw here today that was most disconcerting was the fact that everybody else is a liar but you. I mean we've got all these incidents that are documented by police reports and telephone conversations, and yet everybody else is wrong. The probation officer's report is wrong. So that's a little troubling that -- And it could indicate a number of things. One, that truly they were. I mean truly they made these things up or it could mean that you are just not accepting what happened as something that happened and then move on or something in between. But it is troubling to us when we have not just one person, but a number of people saying that these other circumstances existed and yet you

8

say that they did not.
Answer, Ex. C at 75-76.

According to the 1983 Probation Officer's Report, Ontario Police Department records indicated that on March 18, 1979, Smith got in an argument with Addie Mae. Answer, Ex. A at 11. When she threatened to call the police, Smith ripped the phone cord out of the wall and struck her with a revolver. Id. Addie Mae refused to prosecute. Id. Smith told the Board that those events did not happen. Answer, Ex. C at 63.

On October 6, 1979, Smith and Addie Mae again got into an argument. Answer, Ex. A at 11. Smith again struck Addie Mae with a handgun, causing her to fall to the ground, knocking out some of her teeth, and pushing some of her teeth through her lip. Id. Smith also threatened to kill her. Id.

Officers made several phone calls to Smith. Id. When they eventually reached Smith he stated that Addie Mae was lying and that he had not touched her. Id. During another phone call Smith threatened to "have somebody waste her." Id. Addie Mae later canceled an interview with police officers. Id. Smith again told the Board that none of those events happened. Answer, Ex. C at 64.

On February 11, 1980, Addie Mae and her sister reported that the home in which they were staying with their children had been struck by bullets. Answer, Ex. A at 11. Addie Mae stated that Smith "possibly indicated" his responsibility for the shooting in a recorded conversation. Id. On February 15, 1980, Addie Mae reported that she had three more recorded telephone conversations in which Smith threatened to kill her if she called the police again. Id. at 12. Smith again told the Board those events did not happen. Answer, Ex. C at 65.

On March 6, 1980, Addie Mae's stepfather informed the police about a telephone conversation with Smith during which Smith referred to a recent beating Addie Mae had suffered at the hands of two male coworkers. Answer, Ex. A at 12. Smith allegedly told the stepfather that the "police could do nothing" and threatened that if he did not get his furniture by 6 p.m. she

9

"was a dead woman" and that "the contract is out." Id. Smith told the Board he did not have any conversation with the stepfather. Answer, Ex. C at 67.

Under California law, the Board is authorized to consider "any other information which bears on the prisoner's suitability for release." Cal. Code. Regs., tit. 15, § 2402(b). Smith's inability to acknowledge his prior violence bears upon his suitability for release and the issue of his current dangerousness. If Smith was not able to acknowledge his prior violence he would not have been able to address that violence in therapy. If Smith were released, those unresolved issues could trigger a violent response to the numerous stressors parolees face outside of prison.

The Board's conclusion regarding Smith's need for additional self-help therapy is supported by evidence.

### c)   Lack of Adequate Parol Plan

Upon being paroled Smith planned to live with his mother in Arkansas. Answer, Ex. C at 47. Smith however did not ask his mother to write a letter to the Board confirming that Smith could live with her. Id. When informed that the Board must place Smith somewhere in California, Smith stated that he did not have any place to live in California because he had no family or friends living in the state. Id. at 47-48. The Board found Smith's parole plan inadequate because he had no letters of support and "essentially no place to live." Id. at 74.

Under California law, the Board is authorized to consider "any other information which bears on the prisoner's suitability for release." Cal. Code. Regs., tit. 15, § 2402(b). At the time of the 2003 hearing Smith had spent nearly twenty years in prison. In addition to the stress of transitioning from life in prison to life in the outside world, Smith had no place to live and no family in California to help him. Further Smith murdered the last person he resided with outside of prison, making the Board's consideration of his plan for residency even more important.

Granting Smith parole without a plan for residence would have been improper for the Board and harmful to Smith. A supportive residence is vital to Smith's successful parole.

Without an identified residence, or even a plan for one, it is very likely that Smith would fail parole and return to prison.  The Board's concern that Smith did not have an identifiable residence in California was appropriate.

The Board's finding that Smith's parole plan was inadequate is supported by the record.

### 4) Conclusion

The circumstances of Smith's commitment offense were probative to his current dangerousness when considered in light of the full record before the Board.  That record included Smith's need to participate in additional self-help therapy and his lack of an adequate parole plan.

## V. CONCLUSION

Smith had a violent and abusive relationship with his late wife, Addie Mae Smith. That violence escalated and he eventually executed her.  In doing so Smith nearly killed another person.  His commitment offense was a brutal and vicious attack that showed a total disregard for the lives and suffering of his victims.  Smith never sought medical attention for his victims or took responsibility for his actions.

While Smith undoubtedly and understandably focused on his accomplishments while incarcerated, he continued to avoid acknowledging his violent history.  Further his parole plan was totally inadequate as he lacked even a basic identifiable residence.  The Board could not grant parole without knowing where Smith was going to live, particularly in light of his commitment offense.

Independent review of this record reveals evidence to support the Board's conclusion that at the time of the hearing Smith was unsuitable for parole because he was currently dangerous.  He is therefore not entitled to relief on this claim.

/////

/////

Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 23, 2009

*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE